[Crim. No. 4540.   Second Dist., Div. One.   Mar. 5, 1951.]

THE PEOPLE, Respondent, v. FRANK VETRANO, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, and Stanford D. Herlick, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County, defendant was accused of the crime of incest. Following entry of a plea of not guilty and appropriate waiver of a jury the cause proceeded to trial before the court, resulting in the conviction of defendant. From the judgment of conviction this appeal is prosecuted.

The first ground urged for a reversal is that the evidence is insufficient to support the finding of guilt in that the testimony of the prosecutrix is inherently improbable. It therefore, becomes necessary to summarize the factual background which gave rise to this prosecution.

The record reflects that the complaining witness is the daughter of defendant, and at the time of trial was 15 years of age. She testified ·to several acts of sexual intercourse with her father.

The prosecutrix came to Los Angeles from Brooklyn, New York, approximately two and one-half years prior to the date of trial. When she arrived in Los Angeles she went to live

with her father at the home of her paternal aunt. Several other people were also living there. She and her father occupied a large room in the house which was divided into two portions by a partition. Defendant father slept in the smaller portion of the aforesaid room. According to her testimony, about a month after she arrived and while they were in these quarters, an act of intercourse took place between her and her father. Subsequent acts of intercourse took place in her portion of the room, mostly at night shortly after they had retired. According to the testimony of the complainant, some three months after she commenced to live in this room she made a complaint to her aunt and was given a different room, located next to the aunt. This arrangement continued for approximately two years. During this time, according to the testimony of the prosecutrix, no acts of sexual intercourse took place.

Thereafter, defendant and his daughter moved to quarters in a rooming house, consisting of one room with a bed and a cot. According to the prosecutrix, while living in this room acts of intercourse took place frequently, sometimes as often as two or three times each week.

During the month of February defendant and his daughter were living in this small room. According to her testimony, an act of sexual intercourse took place on or about Lincoln's Birthday of 1950 (this is the act charged in the information). At this time a girl friend of the complaining witness was also sleeping in the room. The complainant slept on the bed with her father and the girl friend slept on the cot.

On the night in question, the prosecutrix was sleeping beside her father and he asked her to have an act of intercourse with him. She testified that it was not a voluntary act of intercourse on her part because at first she refused, then yielded to defendant's persistence. The complaining witness testified that her father showed her a book relating to sexual intercourse entitled "Mother and Daughter." Defendant explained the pictures in the book and said that was one reason he did not want her to go out with boys. The complainant testified that "One time I said, 'Daddy, why do you do this to me, other fathers don't?' and he said, 'O, yes, they do. A lot of them do." She further testified that she "was scared of him, especially when he used to get drunk."

It appears from the record that the complaining witness was 3½ years of age when her mother died. She lived in Brooklyn, New York, with her father and stepmother until she

was 8½ years of age. Thereafter, when her father entered the Army she continued to live with relatives until 1947, when she was 13 years of age, at which time, upon the request of her father, she came to live with him in Los Angeles. She testified that some three months after her arrival she had complained to her aunt, at whose house they were living, about what her father was doing to her. That she had arguments with her father about going out with boys; that her aunt also objected to her going around with a girl friend named Mary Ann. The prosecutrix admitted that on two occasions she stole money from her aunt Mary. That on the first occasion she stole 25 cents, and another time $100. That with this money she bought jewelry and clothing.

At one time complainant's father took her to a school for girls. However, after purchasing uniforms and making other arrangements, she and her father decided that she would not attend this school. The prosecutrix was anxious to live at the home of her girl friend, Mary Ann, and had discussed the matter with the latter's mother. Defendant, however, refused to permit his daughter to live at the residence of the girl friend because of the claimed bad influence of the latter upon his daughter. There was testimony that the complainant had at one time told her aunt Mary that she hated her father, but upon being allowed to explain this statement the witness testified, ''Well, for one thing, if my father was normal—I feel sorry for him in a way because I am telling the truth and all I can do is to get up here and tell it, and if they don't believe me there is nothing that can be done about it, I don't know, maybe he didn't mean to do what he did, maybe it just isn't his fault. . . I don't dislike him.''

In response to a further question, ''Do you like him?'' the complainant responded, ''To a certain extent.''

The witness further stated she told her aunt that she hated her father because she was afraid of him, that this fear was occasioned not from the punishment she received from him and his refusal to allow her to keep company with boys, but rather on account of her father's actions toward her. That her father would get intoxicated and ''look at me as though he wanted to kill me.''

A pelvic examination of complaining witness by a physician on February 20, 1950, revealed an old rupture of the hymen with an eversion of the hymen posteriorly. The vaginal orifice admitted the index finger easily, and it was

the doctor's opinion that this finding was compatible with intercourse. The complainant's girl friend Mary Ann testified that she was 15 years of age. That on or about Lincoln's Birthday in February, 1950, she remained overnight with the complaining witness in the room occupied by the latter and defendant. That she was there three nights in all. She stated that on one evening defendant would not allow the two girls to sleep in the large bed. That he told both of them to sleep on the small cot, but on the night in question defendant told the complaining witness to sleep on the end of the large bed. That at that time, although the lights were off in the room, some light was coming through the window. The witness was unable to see "too clearly." She heard defendant ask, "Justine (his daughter's name), will you let me?"; that the complaining witness answered, "Let you what?" That defendant replied, "You know." That the prosecutrix then said, "No, go to sleep." That defendant "sort of got up like he was going over her. He got over her like, I couldn't see it all the way, but I saw him get up and get over the top of her, and then I didn't hear any more." At this time, according to her testimony, the witness was lying on the small cot in the room. In describing the defendant's actions the witness testified that "He stood like on his knees and you could see a big bulge of the covers." In answer to the question, "Did you see any motion there of any kind?" the witness testified, "I couldn't say for sure."

This witness testified that on the following morning she and the complaint made the bed, and that as they moved a pillow they observed "something under it"—a contraceptive.

Testifying on behalf of the defendant, his sister stated that in December of 1947 defendant brought the complaining witness to live at the sister's home. She testified that the sleeping arrangements were that the complainant slept on a folding bed in the vestibule, that defendant was not sleeping in the same room, but occupied another room in the house. That the room which complaining witness testified she occupied was in fact occupied by a friend of the witness. This witness, who was the aunt of the complainant, denied that the latter ever complained to her about her father's claimed advances toward her. She testified that the prosecutrix stole a total of $438 from her. She testified that she had told the complaining witness that her girl friend Mary Ann was not

welcome in the house because "she runs around with the boys." This witness further testified that the complainant told her on several occasions that she hated her father. Defendant's sister finally ordered both him and the complainant out of the house because, as she testified, "I am having so much trouble with the boys around my house breaking flower pots and the bushes, you have got to get out of the house, you are making a nervous wreck out of me."

The testimony of this witness was corroborated in effect by one of the boarders at her house.

Defendant testified in his own behalf that his room at the residence of his sister had a private entrance. That his daughter, when she first came to California, slept in the vestibule on a couch. He denied that he at any time slept in a room next to that of his daughter. He denied that he had ever had any sexual intercourse with her. He testified that he had trouble with his daughter because she came home so late at night; that he punished her for this; that he admonished her to keep away from her friend Mary Ann; that he made arrangements to put his daughter in a boarding school but that the arrangements were never carried out because of his yielding to her pleas to him not to place her there. He testified to his refusal to permit his daughter to live at the home of her girl friend Mary Ann.

On the night here in question, according to defendant's testimony, the sleeping arrangements were that the visiting girl friend was on the cot and the complainant was at the foot of the large bed. That he woke his daughter up and what he said was, "Get your feet away from me." That thereupon she moved. That he knew the girl was not asleep and did say to her "Come over here, I want to talk to you." That she said, "Don't bother me, I'm sleepy." That he further said, "I don't want Mary Ann to sleep here any more;" that the complaining witness replied, "Don't bother me, I'm tired." To which defendant testified he responded, "You are always tired when I want to talk to you." The defendant not only denied having sexual intercourse with the daughter on the evening charged in the information, but likewise on any other occasion.

With reference to the lighting conditions in the room on the night of the alleged offense, defendant testified that the lights were out and the room was very dark. That the only window was about 12 inches wide and 2 feet long. That there

was a curtain on the window and that no light came through the window. After testifying that he was not married at the time here in question, defendant testified that he was "going out" with his own women friends.

On cross-examination defendant denied that he told a police officer that while residing at the home of defendant's sister he was occupying a bedroom with his daughter. He testified that his statement to the police officer was that they had two separate rooms. In rebuttal, a police officer assigned to the Juvenile Division of the Los Angeles Police Department testified that on February 10, 1950, he had a conversation with the defendant at the police station wherein defendant stated that he slept in the double bed and his daughter slept on the cot; that defendant further stated that he had slept with his daughter on one or two occasions when the latter's girl friend Mary Ann was present.

█ In considering appellant's contention that the evidence is insufficient to sustain the court's decision finding him guilty because of the alleged inherent improbability of the testimony given by the prosecutrix and her girl friend, Mary Ann, it must be remembered that before an appellate tribunal can say that testimony bears upon its face the brand of improbability, or may be said to be unbelievable *per se,* it must involve, we think, a claim that something has been done that it would not seem possible could be done under the circumstances described, or that the falsity of such testimony is made apparent without recourse to inferences or deductions. █ And, evidence which discloses circumstances that are unusual cannot be said to be inherently improbable (*Kidroski* v. *Anderson,* 39 Cal.App.2d 602, 605 [103 P.2d 1000]).

█ While the testimony of the prosecutrix and her girl friend, Mary Ann, revealed a shocking and unusual state of affairs and undoubtedly afforded opportunity for a persuasive argument to the trier of facts against the reliability of such testimony, we see in it nothing from which a reviewing court could justly conclude that their testimony is *per se* unbelievable, and that it was, therefore, the duty of the trial judge, not only to wholly disregard it, but to accept appellant's testimony and that of witnesses in his behalf, or at least find that the appellant's guilt had not been disclosed by the evidence to a moral certainty and beyond a reasonable doubt. Human experience and many reported cases show that incestuous acts do take place. And because they do, section 285 of the Penal Code was enacted.

■ When, as in the instant case, it may not justly and legally be held that the evidence on its face is, as a matter of law, insufficient to support the ultimate issue involved, the function of an appellate court is clearly set forth in the case of *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]. Under the holding therein, before we can set aside the decision of the trial court on the ground of insufficiency of the evidence, "it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." (See, also, *People* v. *Pettis,* 95 Cal.App.2d 790, 794 [213 P.2d 731].) Under the facts and circumstances here present, we are without power to set aside, on the ground of insufficiency of the evidence, the conclusion arrived at by the duly authorized arbiter of the facts.

■ Finally, appellant earnestly insists that the court committed prejudicial error in permitting the prosecutrix to testify regarding alleged acts of intercourse with her father within a period of two and one-half years prior to the offense charged against him, and which prior acts were not pleaded in the information.

At the trial, no objection was raised to the alleged vice of such testimony. While appellant's failure to object in the trial court might well be held to defeat his claim, urged for the first time on appeal, that the admission of such testimony was prejudicial error (*People* v. *Calliham,* 81 Cal.App.2d 928, 933 [185 P.2d 342]), we are disposed to give consideration to such contention.

While it has been held that evidence of other similar acts by an accused *with persons other than the prosecuting witness* ordinarily is inadmissible (*People* v. *Asavis,* 22 Cal.App.2d 492, 494 [71 P.2d 307], and cases therein cited), it is well established that our rule confining the testimony to the crime charged has been so far relaxed as to permit testimony of similar conduct *with the complaining witness (People* v. *Asavis, supra,* p. 495).

The doctrine in this regard is thus declared in *People* v. *Castro,* 133 Cal. 11, 12 [65 P. 13] : "Where, as in this case, there is a continuation of the relation of intimacy and illicit intercourse between the parties to the offense, evidence of improper familiarity and adulterous acts both before and after the act charged is admissible. Such evidence is received to prove the adulterous disposition in the parties implicated.

This appears to be the rule sanctioned by the weight of recent authority.''

Recognizing the reason for the foregoing rule, it cannot here be held, in the absence of objection by appellant in the trial court, that the testimony covering a period of two and one-half years was too remote, or that its admission, under the circumstances here present, constituted reversible error.

For the foregoing reasons, the judgment is affirmed.

Drapeau, J., and Hanson, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 3, 1951.